UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal Case No. 04-387 (ESH) |
| | ) | |
| DAVID SIMON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant has moved to suppress the tangible evidence seized from his person and his vehicle during a traffic stop on June 14, 2004, on the grounds that the stop and the search of his car were unlawful. An evidentiary hearing was held on February 10 and 11, 2005, after which the Court made findings of fact and tentatively granted defendant's motion, but allowed the United States to submit additional briefing. Upon consideration of the evidence presented and the pleadings filed by the parties, the Court concludes that defendant's motion should be granted.

### FACTS

Metro Transit Police Officer John Freeny was parked at the entrance to the Rhode Island Avenue Metro Station when he observed defendant's vehicle fail to stop at a stop line[1] just outside of Washington Metropolitan Area Transit Authority ("WMATA" or "Metro") property. Officer Freeny mistakenly believed that the stop line was on WMATA property and for two to three years had been giving tickets to drivers who disregarded the stop signal. (Feb. 11 Tr. at

---

[1] There is no stop sign at the intersection. Rather, the word "STOP" is painted on the roadway. (Transcript of Motion Hearing, Feb. 11, 2005 ["Feb. 11 Tr."] at 3.)

33.) He pursued defendant's vehicle to a nearby supermarket parking lot (not owned by

WMATA), where he conducted a traffic stop. As he followed the car, he ran its license plate

number and determined that the vehicle was unregistered. When he approached the vehicle,

defendant told him that he did not have a driver's license. Defendant gave the officer his expired

learner's permit. Officer Freeny responded that it was "okay" and he would "attempt to work

with him." (Feb. 10 Tr. at 32.) After running a records check and speaking with Officer Boehm,

who had also arrived on the scene, Officer Freeny asked Mr. Simon to get out of the car. He then

informed him that his vehicle would be impounded. As explained at the evidentiary hearing, the

vehicle was "unregistered . . . uninsured . . . and he d[id] not have a diver's license. He shouldn't

[have been] driving the car, and the car shouldn't [have been] on the street." (Feb. 10 Tr. at 34.)

Officer Freeny testified that, at this point, he planned to issue several traffic citations to

defendant and let him make arrangements to find his own way home. (Feb. 11 Tr. at 20-22.)

Officer Freeny called a private towing company to tow the car and the car was eventually towed

to the company's private lot; it was never taken into police custody. (*Id.* at 26.)

After the officers had instructed Mr. Simon to stand on the curb, Officer Boehm

proceeded to conduct an inventory search. Officer Freeny testified that this is standard Metro

Transit Police procedure when a car is impounded. (Feb. 10 Tr. at 35.) Officer Boehm

discovered an asp (an expandable metal baton usually carried by law enforcement) in the front

seat. The officers explained to Mr. Simon that possession of this weapon is prohibited and

proceeded with the inventory search. Upon opening the trunk, Officer Freeny observed a number

of small plastic ziploc bags, which, based on his experience, he identified as drug paraphernalia.

(*Id.* at 38.) At this juncture, Officer Freeny informed defendant he was under arrest. (*Id.* at 39.)

- 2 -

Officer Freeny reached for Mr. Simon to effectuate the arrest, at which point Mr. Simon pulled away and "grabbed" a small bag that was attached to his body across the front. Officer Freeny ordered defendant to "get off the bag" and eventually got him to let go of it, and handcuffed him on the ground. (*Id.* at 40.) He patted him down for weapons and drugs and then returned to the bag and opened it. Inside the bag was a loaded nine-millimeter handgun, ammunition, a phone, a digital scale, two plastic bags containing a chalk-like substance that later field-tested positive for cocaine base, an ice pick, and more small ziploc bags.

At the conclusion of the evidentiary hearing, the Court made the following findings of fact: (1) defendant was not on WMATA property when he failed to stop at the stop line; (2) Officer Freeny had a subjective belief that the stop line was on WMATA property; and (3) Officer Freeny had no intent to arrest defendant until he looked in the trunk of his vehicle. Before that point, he intended to give the defendant several traffic citations and let defendant go on his way. (Feb. 11 Tr. at 66-67.)

## ANALYSIS

### I. The Metro Transit Police Officer Had No Authority to Stop Defendant's Vehicle

The WMATA Compact, D.C. Code § 9-1107.01, provides for the establishment of the Metro Transit Police ("MTP") force. Section 76(a) of the Compact defines MTP jurisdiction as including "all the Transit facilities (including bus stops) owned, controlled, or operated by the Authority." MTP officers have the power to make arrests off of WMATA-controlled property in three limited situations: (1) "for violations committed upon, to, or against" transit facilities, while in "hot or close pursuit," *id.*, (2) "when [on duty and] immediate action is necessary to protect the health, safety, welfare or property of an individual from actual or threatened harm or from an

unlawful act," *id.*, and (3) to execute traffic citations and criminal process "with respect to offenses committed upon, to, or against the transit facilities owned, controlled, or operated by the Authority." *Id.* § 76(c). As explained in *United States v. Foster*, 566 F. Supp. 1403 (D.D.C. 1983), "[a] Metro Transit Police official cannot patrol the streets of D.C. making traffic stops and/or arrests *unless* the offenses in question originated on or against WMATA facilities." *Id.* at 1411 (emphasis in original). *See also Griggs v. WMATA*, 66 F. Supp. 2d 23, 27-28 (D.D.C. 1999) (citing *Foster* and describing WMATA jurisdiction as "extremely circumscribed").

Despite the Court's finding at the evidentiary hearing that "defendant committed no violation of traffic laws or anything else on WMATA property," and further, "did not commit an offense upon, to or against transit facilities or any transit property" (Feb. 11 Tr. at 61), the government now argues that Officer Freeny had jurisdiction to stop defendant because the traffic offense was "clearly a violation *against* that Metro parking facility." (Supp. Opp'n to Def.'s Mot. to Suppress Tangible Evidence ["Supp. Opp'n"] at 5 (emphasis in original).) In support of this conclusion, it argues that "when a person runs that stop sign, it clearly places the Metro transit patrons at grave risk of harm." (*Id.*) The Court cannot accept this tortured interpretation of "against," which would extend the reach of the statute far beyond its intent. The destruction of Metro property would clearly constitute a violation "against transit facilities," but a traffic violation *near* transit facilities cannot suffice. Moreover, there is no evidence that defendant placed any individual in immediate harm, requiring a response from Officer Freeny. As in *Foster*, "[defendant was] not operating a motor vehicle on WMATA property, and there was no indication that [he was] involved in criminal activity on or near any subway stations or bus stops." 566 F. Supp. at 1412. Thus, Officer Freeny had no jurisdiction to stop Mr. Simon's

- 4 -

vehicle.[2]

## II. The Stop of Defendant's Vehicle Violated the Fourth Amendment

In *Foster*, this Court held that where an MTP officer makes an arrest outside his or her jurisdiction, the officer violates the arrested individual's Fourth Amendment rights. As stated by the Court, "the concept of reasonableness embodied in the Fourth Amendment logically presupposes an exercise of lawful authority by a police officer. When a law enforcement official acts beyond his or her jurisdiction, the resulting deprivation of liberty is just as unreasonable as an arrest without probable cause." *Id.* Objecting to *Foster's* conclusion, the government argues that, even if Officer Freeny lacked jurisdiction, defendant's constitutional rights were not violated because Officer Freeny had reasonable suspicion to make the stop. (*See* Supp. Opp'n at 5 n.3 & 6-9.)

Courts are split as to whether an arrest is *per se* unreasonable when an officer acts outside his or her jurisdiction. *Foster* is the only federal case in this Circuit to have addressed the issue. The District of Columbia Court of Appeals came to the same conclusion in *District of Columbia v. Perry*, 215 A.2d 845 (D.C. 1966), when it suppressed evidence against the defendant on the grounds that a Maryland police officer did not have authority to stop defendant's vehicle in the District of Columbia. *Id.* at 847. Similarly, in *Ross v. Neff*, 905 F.2d 1349 (10th Cir. 1990), the Tenth Circuit found a Fourth Amendment violation under § 1983 when an Oklahoma state police officer arrested plaintiff (a Native American) on Tribal trust land, which was outside the officer's jurisdiction. The court explained that "a warrantless arrest executed outside of the arresting

---

[2]*Andersen v. United States*, 132 A.2d 155 (D.C. 1957), upon which the government relies, is not applicable. *Andersen* considered the jurisdiction of the Capitol Police, whose authority-granting statute is significantly different from the language in the WMATA Compact. *Id.* at 156.

officer's jurisdiction is analogous to a warrantless arrest without probable cause. . . . Absent

exigent circumstances, such an arrest is presumptively unreasonable." *Id.* at 1354. *See also U.S.*

*v. Medearis*, 236 F. Supp. 2d 977 (D.S.D. 2002) (warrantless arrest executed outside of the

arresting officer's jurisdiction violates the Fourth Amendment).

Other courts have held that an extrajurisdictional arrest is not necessarily

unconstitutional. For instance, in *Pasiewicz v. Lake County Forest Preserve Dist.*, 270 F.3d 520

(7th Cir. 2001), also a § 1983 action, a county forest preserve officer arrested the plaintiff outside

the forest preserve, thereby violating a state statute that defined the parameters of his jurisdiction.

The court, noting disagreement with *Foster*, concluded that the county forest preserve officer's

statutory violation did not rise to the level of an unreasonable seizure. *Id.* at 527 n.3. The court

also distinguished *Ross*, stating that whereas *Ross* dealt with "a state officer's ability to arrest a

Native American on tribal trust land," the arrest of Mr. Pasiewicz "concerned the jurisdiction of

officers acting between *political subdivisions of the same state*." *Id.* (emphasis added). In

*United States v. Mikulski*, 317 F.3d 1228 (10th Cir. 2003), the Tenth Circuit adopted *Pasiewicz*'s

distinction. *Id.* at 1232. There, a police officer from one county in Utah made an arrest in

another Utah county in violation of a statutory requirement that he notify and receive approval

from local law enforcement officials. The court held that there was no Fourth Amendment

violation in part because "any contact with the local law enforcement authority at this time was

not 'reasonably possible.'" *Mikulski*, 317 F.3d at 1233 (quoting Utah Code Ann. § 77-9-3(2)(a)).

The Eighth Circuit, in *Abbott v. City of Crocker*, 30 F.3d 994, 997-98 (8th Cir. 1994), also found

that extrajurisdictional conduct is not *per se* unconstitutional. The court refused to find as a

matter of law that an officer who made an arrest outside city limits, where he had no authority to

- 6 -

do so, had acted unreasonably. *Id.* ("not every unauthorized arrest is 'unreasonable' in the constitutional sense"). Finally, in *Madsen v. Park City*, 6 F. Supp. 2d 938 (N.D. Ill. 1998), the court held that an officer's lack of authority to stop the plaintiff in a particular part of Illinois would be an insufficient basis for liability under § 1983. *Id.* at 945 (finding, however, that the officer did have authority to stop plaintiff).

Although the Court recognizes that it is not bound by *Foster* and that contrary authority exists to uphold this stop, it finds *Foster*'s reasoning to be more persuasive since the contrary case law is factually distinguishable. Only *Foster* addresses the *sui generis* situation posed by the WMATA Compact. Whereas *Mikulski* and *Pasiewicz* considered officers who intruded upon the jurisdiction of another political subdivision within the same state, WMATA is an interstate and quasi-federal entity that is distinct from the District of Columbia government. *See Barbour v. WMATA*, 374 F.3d 1161, 1163 (D.C. Cir. 2004) ("WMATA was formed by an interstate compact between Maryland, Virginia, and the District of Columbia, and enjoys the Eleventh Amendment sovereign immunity of the two signatory states."); *KiSKA Const. Corporation-U.S.A. v. WMATA*, 167 F.3d 608, 609 (D.C. Cir. 1999) ("Congress consented to the WMATA Compact pursuant to article I, § 10 of the Constitution, so the Compact has been transformed into federal law under the compact clause."). Unlike Utah police officers working in different counties within the same state, WMATA officers are not interchangeable with the Metropolitan Police officers.[3] The WMATA police force was established to protect transit facilities from offenses thereon, not to perform criminal investigations or to effect traffic stops on

---

[3]Indeed, the government argues that WMATA officers need not follow MPD procedures when conducting automobile inventory searches. (*See* Supp. Opp'n at 13.)

city streets, except in very limited circumstances. *See* D.C. Code § 9-1107.01, subsec. 76(a)-(h). Its authority is limited not only by geography, but also, and most importantly, by the narrowly circumscribed role of transit police. This careful limitation on WMATA's jurisdiction is part of the agreement reached among the states entering into the Compact, and the overstepping of its bounds is not an insignificant trespass. The officer's action here is therefore more akin to the Oklahoma state officer's arrest on tribal land in *Ross* than, for example, to the Crocker police officer's arrest outside Crocker city limits in *Abbott*.

The result reached here is also consistent with the well-recognized rule that it is not reasonable for an officer to rely upon a mistaken understanding of the law. *See, e.g., United States v. Mariscal*, 285 F.3d 1127, 1131 (9th Cir. 2002) ("If an officer simply does not know the law, and makes a stop based upon the objective facts that cannot constitute a violation, his suspicions cannot be reasonable"); *United States v. Twilley*, 222 F.3d 1092, 1096 (9th Cir. 2000) (stop based on officer's mistaken belief that Michigan law required a front license plate was "not supported by reasonable suspicion and therefore violated the Fourth Amendment"); *United States v. Miller*, 146 F.3d 274, 279 (5th Cir. 1998) ("[While] law enforcement officers [have] broad leeway to conduct searches and seizures regardless of whether their subjective intent corresponds to the legal justifications for their actions . . . the flip side of that leeway is that the legal justification must be objectively grounded."). As in the cited cases, Officer Freeny relied on a mistaken understanding of the law to the extent that he believed that WMATA's property encompassed the stop line, and while he subjectively believed that he had jurisdiction, that was not legally the case. Thus, since the officer relied upon a mistake of law, he lacked "the reasonable suspicion required for a constitutional traffic stop." *Twilley*, 222 F.3d at 1096.

For these reasons, the Court concludes that when Officer Freeny stopped defendant's vehicle without any legal authority to do so, he violated defendant's Fourth Amendment right to be free from unreasonable search and seizure.[4]

### III. The Fruits of the Illegal Stop Must be Excluded from Evidence

Where a defendant's constitutional rights have been breached, exclusion of unlawfully obtained evidence from trial is an appropriate remedy. *Wong Sung v. United States*, 371 U.S. 471, 488 (1963). The government, nonetheless, contends that because "the traditional rationale for employing the exclusionary rule is to deter government misconduct," and Officer Freeny's behavior does not qualify as such, defendant is not entitled to suppression. (Supp. Opp'n at 9-11.) The Court cannot agree.

Although Officer Freeny no doubt believed he was acting within his jurisdiction when he stopped defendant's vehicle, his good faith is irrelevant to the question of whether the fruits of his stop should be suppressed. The Supreme Court established a "good-faith exception" to the exclusionary rule in *United States v. Leon*, 468 U.S. 897 (1998), but this exception applies only when police reasonably rely on a neutral source, such as a warrant issued by a detached and neutral magistrate or a statute that is later found to be unconstitutional. *Id.* Several circuit courts have therefore explicitly held that the good-faith exception does "not . . . extend[] to excuse a vehicular search based on an officer's mistake of law." *United States v. Chanthasouxat*, 342 F.3d 1271, 1280 (11th Cir. 2003) (holding that officer's reasonable mistake of law cannot provide reasonable suspicion or probable cause to justify a traffic stop). *See also United States v.*

---

[4]Though the government devotes great effort to demonstrating that defendant committed a traffic violation (Supp. Opp'n at 8), that is simply not the relevant issue. What is relevant is whether Officer Freeny had the legal authority to stop defendant for this violation.

*King*, 244 F.3d 736, 739 (9th Cir. 2001).[5] As explained by the Ninth Circuit, "there is no good faith exception to the exclusionary rule for police who do not act in accordance with governing law. To create an exception here would . . . remove the incentive for police to make certain that they properly understand the law that they are entrusted to enforce and obey." *United States v. Lopez-Soto*, 205 F.3d 1101, 1106 (9th Cir. 2001) (stop based on mistaken belief that Baja California vehicle code required that vehicle's registration sticker be visible from the rear of the vehicle, when law actually required only that the sticker be placed on the upper right-hand corner of the windshield, was unconstitutional); *United States v. Lopez-Valdez*, 178 F.3d 282 (5th Cir. 1999) (good faith exception to the exclusionary rule did not apply to state trooper's erroneous belief that vehicle's broken taillight violated Texas law).

As the government correctly notes (Supp. Opp'n at 10), the exclusionary rule is meant to "deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." *United States v. Calandra*, 414 U.S. 338, 347 (1974). Exclusion of the evidence in this case serves the purpose of encouraging law enforcement officers to know the bounds of their authority, which, as noted by the Ninth and Eleventh Circuits, is especially important since there is a "fundamental unfairness [in] holding citizens to 'the traditional rule that ignorance of the law is no excuse' while allowing those

---

[5]Where an officer makes a mistake of *fact*, however, this mistake may be excused if the mistake was "objectively reasonable." *United States v. Hill*, 131 F.3d 1056, 1059 (D.C. Cir. 1997) (district court's finding that police officers "believed" Hill had violated the traffic laws was not sufficient to excuse mistake; case was remanded to determine whether belief was objectively reasonable). *See also United States v. Whitfield*, 939 F.2d 1071, 1074 (D.C. Cir. 1991) (agreeing that the Supreme Court in *Illinois v. Rodriguez*, 497 U.S. 177 (1990) "held only that the Fourth Amendment does not invalidate searches based on a reasonable mistake of fact, as distinguished from a reasonable mistake of law").

'entrusted to enforce' the law to be ignorant of it." *Chanthasouxat*, 342 F.3d at 1280 (quoting

*Lopez-Soto*, 205 F.3d at 1106).[6]

## CONCLUSION

For these reasons, the Court concludes that defendant's motion to suppress all tangible

evidence related to the June 14, 2004 stop of his vehicle must be granted.


_E/Lens, Huvell_
ELLEN SEGAL HUVELLE
United States District Judge

Date:   April 1, 2005

---

[6]Given the Court's resolution of the issue of whether the initial stop of the car was lawful, it need not reach the novel issue of whether the inventory search conducted here should be judged against MPD's or WMATA's internal guidelines, nor need it determine whether the officer's conduct may be justified by the search incident to arrest exception to the Fourth Amendment.